UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARCI WEBBER,

    Plaintiff,

  v.

SYED HUSSAIN, et al.,

    Defendants.

No. 14 CV 5987

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Marci Webber resides at the Elgin Mental Health Center as an involuntarily committed patient. She initiated this action after being forcibly injected with sedatives on two separate occasions, despite voicing her opposition to psychotropic medication of any kind. She alleged that in doing so, the Center's staff violated her constitutional rights, and she seeks damages under 42 U.S.C. § 1983.

After a motion to dismiss her first amended complaint was granted in part, *see* [22],[1] Webber filed a second amended complaint, [29]. Several defendants filed another motion to dismiss, and that too was granted in part. *See* [51]. Still pending are three claims: 1) a first-amendment retaliation claim against security guards William Epperson and Gus Cabezudo, nurse Gloria Lagunilla, and doctor Syed Hussain related to both injections; 2) a fourteenth-amendment excessive force claim against Epperson, Cabezudo, and Lagunilla related to the first injection; and 3) a fourteenth-amendment excessive force claim against Hussain related to the second

---

[1] Bracketed numbers refer to entries on the district court docket.

injection. Defendants now move for summary judgment against Webber on all of these claims. For the following reasons, defendants' motion is granted.

I.  **Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

When a proposed statement of fact is supported by the record and not properly controverted by the opposing party, that statement will be accepted as true. *See* N.D. Ill. Local Rule 56.1(b)(3)(c) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party); *id.* 56.1(a) ("All material facts set forth in the statement filed [by the opposing party] will be deemed admitted unless controverted by the statement of the moving party."); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir.2003). To adequately dispute a factual statement, the

opposing party must cite specific support in the record. *See* N.D. Ill. Local Rule 56.1(b)(3). Uncorroborated, self-serving testimony may be used to dispute a material fact, but only if based on personal knowledge or firsthand experience. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). But a denial based on argument or conjecture does not create a genuinely disputed issue of material fact. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).

## II. Facts[2]

Webber has taken some liberties with the Local Rule 56.1 process. Rather than providing a responsive statement to defendants' statement of facts, containing individual and numbered responses with cites to the record, she submits a single affidavit in which she disputes, comments on, or characterizes those factual statements.[3] Her statement of additional facts contains several inferences and arguments which do not appear in her memorandum of law.[4] Local Rule 56.1 serves

---

[2] The facts are largely taken from defendants' Local Rule 56.1 statement, [72], Webber's affidavit which serves as her response, [79], and defendants' response to Webber's LR 56.1 statement, [85].

[3] Webber initially filed an unsworn affidavit, [79], but later filed a notarized signature page as a separate docket entry, [90]. Defendants ask that the affidavit be stricken, because it contains neither a notarized signature nor a statement that its contents are true under penalty of perjury pursuant to 28 U.S.C. § 1746. Defendants further request that their statement of facts be considered undisputed in its entirety. Webber's motion to supplement her affidavit with a notarized signature page was granted, *see* [88], and the affidavit is admitted. To the extent the affidavit properly controverts any factual statements in defendants' LR 56.1 statement, those statements will be considered disputed.

[4] In addition, and much to the consternation of defendants, Webber filed both a 7-page Response in Opposition to Defendants' Motion for Summary Judgment, [77], and a 15-page Memorandum of Law in Support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, [78]. Webber's filing of excess pages of argument violates LR 56.1 and LR 7.1's page limit, and defendants request that the Response in Opposition be stricken. That request is denied, as the excess pages do not affect the outcome of this motion.

an important function—it organizes the evidence and identifies factual disputes—and district courts may require strict compliance with it. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir.2005). That said, Webber's affidavit adequately addresses most of defendants' factual statements in a sufficiently organized manner. Those facts which Webber fails to properly controvert, whether by ignoring them or by disputing them with conjecture, are deemed admitted. And any arguments raised in the Local Rule 56.1 statements will be disregarded. The material facts are set forth below.

In 2012, Marci Webber was involuntarily confined to Elgin Mental Health Center, where she has resided to this day, after a finding of not guilty by reason of insanity for the murder of her daughter. [72] ¶¶ 2–3, 6; [79] ¶¶ 10, 12. Upon arrival, a state psychiatrist diagnosed her as suffering from schizoaffective disorder, bipolar, and paranoid personality disorder. [72] ¶ 6; [79] ¶ 12. And since June 2013, Webber has refused any treatment consisting of psychotropic medication. [72] ¶ 7; [79] ¶ 13. But twice during her confinement—on May 3, 2014 and September 16, 2014—Webber was forcibly injected with medication. [72] ¶ 40.

### A. May 3, 2014

Around 7:35 p.m. on May 3, 2014, Webber entered the dining area of her unit at the Center. [72] ¶ 8. Before she could get too far, however, Center staff members Marva Stroud and Velma Westbrook asked her to leave. [72] ¶ 9; [79] ¶ 14. Before leaving, Webber argued with Stroud and Westbrook for a couple of minutes over

4

why she was being asked to leave. [72] ¶¶ 10–13; [79] ¶¶ 15–18. She then left the dining area and headed toward the female day area. [72] ¶ 13; [79] ¶ 18. Around 7:40 or 7:42 p.m., nurse Jocelyn Azarias arrived at the scene after hearing loud noises and deciding to investigate. [72] ¶¶ 14–16; [79] ¶ 5. She found Webber still arguing with Stroud and Westbrook, and considered Webber's behavior to be increasingly aggressive. [72] ¶ 18; [79] ¶ 5. Center security personnel William Epperson and Gus Cabezudo arrived a minute or two later, and Azarias and other staff tried to get Webber to return to her room. [72] ¶¶ 19–20; [79] ¶ 5. While Azarias claims she was trying to calm Webber down, Webber viewed her efforts as attempts to antagonize her. [72] ¶ 20; [79] ¶ 22. Azarias also offered Webber oral medication, but Webber refused. [72] ¶ 21.

At this point, Azarias called the medical officer on duty, Dr. Mohammad Hosain, and relayed to him by phone her observations of Webber. [72] ¶ 22. Hosain ordered the administration of 2 milligrams of the sedative Lorazepam, and a Restriction of Rights that would authorize staff to physically restrain Webber to administer the injection. [72] ¶¶ 23–24. Azarias conveyed those instructions to nurse Gloria Lagunilla, who had also arrived on the scene to assist Azarias and the others. [72] ¶¶ 26–28. While Azarias conferred with the others, Webber returned to her room, where she remained for roughly ten minutes, perfectly calm. [79] ¶ 5.

Then security member Zella Napier told Webber that the nurse wanted to see her, and Webber followed Napier to the nurse's station. [72] ¶¶ 30–32; [79] ¶ 6. There, Webber met with Lagunilla, who had already prepared the injection. [72]

5

¶¶ 33–34; [79] ¶ 25. Webber stated her objection to receiving an injection, at which point Cabezudo and Epperson physically restrained her, by holding her wrists and one thigh, until the injection could be administered. [72] ¶¶ 34–36; [79] ¶¶ 7; 28.

### B.     September 16, 2014

On the morning on September 16, 2014, after being involved in a physical altercation with another patient, Webber was on "one-to-one observation" to protect her from harm. [72] ¶¶ 41–42. When a patient is on one-to-one observation, a staff member is assigned to keep watch and ensure that she does not have access to shoelaces, belts, or anything else that could be harmful. [72] ¶ 42; [79] ¶ 31. Between 8:00 and 8:30 a.m., she met with Center doctor Syed Hussain. [72] ¶ 43; [79] ¶ 32. During this meeting, Hussain came to the conclusion that Webber's mental condition had worsened since he had seen her the day before. [72] ¶ 45. After their meeting, Webber returned to her room, still under one-to-one observation, but soon left her room and went to the nurse's station. [72] ¶¶ 46–47; [79] ¶ 33. At the nurse's station, Webber complained about the staff member who had been assigned to her one-to-one observation. [72] ¶ 48; [79] ¶ 34. The staff alerted Hussain to Webber's behavior, which included arguing with staff members and pointing fingers at them, and he left a treatment session with another patient to assist. [72] ¶ 49. Hussain and some staff members met with Webber in a conference room to discuss what was bothering her. [72] ¶ 51. During that conversation, Hussain noted that she was jumping from topic to topic—something he described as a "flight of ideas." [72] ¶¶ 52–53; [79] ¶ 37. Webber viewed

6

Hussain's and the staff member's conduct during this meeting as antagonizing behavior. [79] ¶ 39. Webber then agreed to go to her room, but a few minutes later, she refused to remain there. [72] ¶ 57. Hussain was again pulled out of a meeting to assist with the situation. *Id.* During Hussain's discussion with Webber, he determined that she posed a threat of imminent harm to him and others, authorized an injection of Haloperidol, Lorazepam, and Diphenhydramine, and ordered a Restriction of Rights to physically restrain her. [72] ¶¶ 61–67. Webber got down on the floor and begged staff not to inject her, but security personnel moved her into an upright position, and two nurses administered the medication. [72] ¶¶ 68–70; [79] ¶ 47; [85] ¶ 21.

## III. Analysis

### A. The Retaliation Claim

To establish a prima facie case for first-amendment retaliation, a plaintiff must show that (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter first-amendment activity in the future; and (3) the first-amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). A defendant may rebut the third prong of the test by showing that the first-amendment activity was not a necessary or "but-for" cause of the retaliatory action. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 285–87 (1977); *Greene v. Doruff*, 660 F.3d 975, 977–80 (7th Cir. 2011).

While Webber makes a fleeting reference in her argument to statements she made that were critical of psychotropic medication, Webber provides no evidence suggesting that the forced injections were in retaliation for, or even related to, those statements, and she does not address defendants' arguments relating to this claim. There is no evidence in the record that on May 3, Epperson, Cabezudo, or Lagunilla knew of her first-amendment activity prior to receiving the instruction to administer the medication. And even if they did know of her opposition to medication, whether any retaliatory animus or personal hostility played a part in their actions is irrelevant, because they would have administered the injection anyway. They were, after all, performing at the instruction of the doctor on duty, Hosain. Thus, any "improper motive would have done no work, had no effect, left the world unchanged," and does not amount to a constitutional tort. *Greene*, 660 F.3d at 978.

Similarly, for the September 16 incident, Webber provides no evidence to show that Hussain's ordering of an injection was in any way connected to her outspoken criticism of psychotropic medication, and does not explicitly argue in support of her retaliation claim in her brief. The most generous interpretation of Webber's argument is that she did not present an imminent risk of harm, so Hussain could not have ordered the injection due to a safety concern. And if safety were not his goal, perhaps he was punishing Webber for her first-amendment activity. She does not explicitly make this argument, but even if she did, the causal relationship between her protected speech and the injection is too attenuated for the

8

argument to succeed. Hussain and Webber had several interactions before the injection that were unrelated to the speech in question, and he received reports of her behavior from other staff members. Webber cannot establish that Hussain administered the injection because of her protected speech. Therefore, summary judgment for the first-amendment retaliation claim is granted as to all defendants.[5]

### B. The Excessive Force Claims

An involuntarily committed plaintiff can prevail on an excessive force claim under the Fourteenth Amendment by showing that the force used against her was "objectively unreasonable," taking into consideration the government's "need to manage the facility in which the individual is detained," and "deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security."[6] *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (internal quotations omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). In other words, a plaintiff can prevail by providing "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74 (2015). And in this context, punishment is not a legitimate government objective. *Id.* at 2473. Factors bearing on the reasonableness determination include "the relationship between the need for the

---

[5] It is clear that Webber has strong beliefs on the use of psychotropic medication, which seem to animate much of her dispute with the Center. But those beliefs are not dispositive in the context of either her first-amendment or excessive force claims.

[6] As explained in the first motion to dismiss order, an involuntarily committed patient is in the same position as a pretrial detainee in the context of an excessive force claim under the Fourteenth Amendment. *See* [22] at 6–8.

9

use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*.

But where the challenged conduct was performed in the medical context by a medical professional, it is presumed valid. *See Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). This presumption may be overcome, and the medical professional may be subjected to liability, "only when the decision by the professional [was] such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the [professional] actually did not base the decisions on such judgment." *Id*.

Defendants argue that, as employees of a state-operated facility, they are shielded from liability in this action by the doctrine of qualified immunity, which "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015) (internal quotation omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id*. "When

10

properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id*. "[Courts] do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. Determining whether the defendants are entitled to qualified immunity involves two questions (in any order) "(1) whether 'the facts alleged show the [official's] conduct violated a constitutional right,' and (2) whether 'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).

1. *The May 3, 2014 Injection*

Defendants Lagunilla, Cabezudo, and Epperson are immune from suit because it was not clearly established that their conduct on May 3, 2014, was unlawful. The record reflects that Lagunilla, a nurse, administered an injection against Webber's will on May 3, 2014, but that she did so at the direction of the doctor on duty, Hosain. Nurses are expected to defer to treating doctors' instruction in most situations, *see Bowers v. Seymour*, 436 F. App'x 676, 681 (7th Cir. 2011), and Webber does not provide any reason as to why Lagunilla should have deviated from those instructions. Nor does she explain how it was clearly established that the Constitution required Lagunilla to disregard Hosain's instructions in these circumstances.

Similarly, security guards Cabezudo and Epperson were acting on the doctor's instructions in restraining Webber while the authorized injection was

11

administered. Again, Webber does not address whether it would be clear to a reasonable security guard that restraining a patient to allow for a doctor-approved injection was unlawful. Considering they restrained her just long enough for the injection to be administered and did nothing more than follow the doctor's instructions, it would not be reasonable for them to think their conduct clearly unlawful. *See Brant v. Volkert*, 72 Fed. App'x 463, 466 (7th Cir. 2003) ("Moreover, Officers Cass and McClain followed the instructions of their supervisor and the procedures of the Freeport police department in effectuating Brant's arrest. Under these circumstances, the officers are entitled to qualified immunity because it cannot be said that their belief that their actions were lawful was unreasonable.").

Whether nonparty nurse Azarias accurately conveyed the situation to the nonparty doctor Hosain, whether Lagunilla, Cabezudo, and Epperson personally thought the injection was medically necessary, and whether the injection was ultimately warranted—all points raised by Webber—are not material issues. The question for qualified immunity purposes is whether it was clearly established that Lagunilla, Cabezudo, and Epperson should have refused the doctor's instructions. It was not, and those defendants are thus shielded from liability by the doctrine of qualified immunity. Summary judgment as to the excessive force claim is granted in their favor.

### 2. *The September 16, 2014 Injection*

Likewise, it was not clearly established that defendant doctor Hussain's decision to order the September 16, 2014 injection was unlawful, or "such a

12

substantial departure from accepted professional judgment, practice, or standards as to demonstrate the [doctor] actually did not base the decisions on such judgment." *Youngberg*, 457 U.S. at 323. Earlier in the day, Webber had been involved in a physical altercation with another patient, and was placed under one-to-one observation. While meeting with Webber that morning, Hussain came to the conclusion that her mental condition had worsened from the day before. Staff later pulled Hussain out of a meeting, telling him that Webber had left her room, was complaining about her one-to-one observer, and was pointing fingers at them. He and other staff members then spoke with Webber, who was jumping from topic to topic—what Hussain described as a flight of ideas. Webber left the meeting to return to her room, but refused to remain inside, and staff called Hussain to assist again. During their conversation, Hussain determined that Webber posed a threat of imminent harm, and ordered an injection.

Webber argues that she did not pose a threat of imminent harm, but does not address whether Hussain's decision to order an injection constituted the substantial departure from professional judgment that would make his action unlawful. Hussain arrived at this decision after observing Webber and hearing of the observations of his staff, who had requested his assistance twice that morning. One of Webber's expert witnesses, Dr. Jon Berlin, questioned Hussain's methods at de-escalating situations, but even he admitted that the injection may have been necessary. [72] ¶ 71; [79] ¶ 48; [85] ¶¶ 34–35. And even if the injection were unnecessary, Hussain's de-escalation methods ineffective, and his professional

13

judgment shoddy, his many interactions with Webber prior to the injection and his observations of her behavior show that he was using some minimal judgment in treating Webber, rather than no judgment at all. It was not clearly established that Hussain's decision to order an injection was unlawful, and he is therefore shielded by qualified immunity. Summary judgment as to the excessive force claim is granted in Hussain's favor.

### C. Webber's Other Arguments

As noted above, Webber does not address the issues raised by defendants in their motion. Instead, she makes a variety of other factual assertions and legal arguments relating to Illinois standards for medical professionals, the suitability for Webber of an ongoing treatment plan that incorporates psychotropic medication, and her procedural due process rights. Ultimately, Webber's arguments do not relate to her excessive force claims under the Fourteenth Amendment or her retaliation claim under the First Amendment, and they do not shed light on whether defendants took action because of Webber's speech or whether defendants' roles in the injections violated clearly established constitutional law. They are therefore insufficient to defeat summary judgment.

## IV. Conclusion

Defendants' motion for summary judgment [70] is granted. Enter judgment in favor of defendants, and terminate civil case.

ENTER:

                                                     Manish S. Shah
                                                    United States District Judge

Date: 5/23/16